# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 31, 2017

Lyle W. Cayce
Clerk

No. 16-41449

————

FAIRMONT CASH MANAGEMENT, L.L.C., doing business as Cash Cow
Pawn,

> Plaintiff - Appellant

v.

TANARRA JAMES, Director of Industry Operations, Bureau of Alcohol,
Tobacco, Firearms and Explosives,

> Defendant - Appellee

————

Appeal from the United States District Court
for the Southern District of Texas

————

Before STEWART, Chief Judge, and HIGGINBOTHAM and COSTA, Circuit
Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Based on numerous violations of the federal Gun Control Act, the ATF decided to revoke Cash Cow Pawn Shop's federal firearms license ("FFL"). After an administrative hearing, Cash Cow exercised its right to challenge that revocation decision in federal court, but the district court granted summary judgment against it. Cash Cow appealed, asserting error in the grant of summary judgment, as well as in various discovery and procedural rulings of the district court. We affirm.

No. 16-41449

## I.

Fairmont Cash Management, LLC, is a Texas company doing business in Alvin as "Cash Cow Pawn." Cash Cow is owned and operated by Derek Munz. Munz has a long history in the pawn shop business, operating at least a dozen since 1994, all of which held federal firearms licenses permitting them to sell guns to members of the public provided they complied with applicable federal regulations. Munz opened Cash Cow in 2007 and obtained an FFL for it that same year.

With the privileges attendant to an FFL come burdens; in addition to stringent documentation requirements, FFL-holders are subject to unannounced compliance inspections by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the federal agency charged with administering FFL licensure. To Cash Cow's credit, it was subject to one such inspection in 2010, and received an entirely clean bill of compliance. The ATF thereafter left it alone until early in 2013, when the agency received an anonymous tip that Cash Cow had unlawfully sold firearms to people federally prohibited from possessing them.

As a result, the ATF launched an undercover investigation of Cash Cow. On three different occasions, the agency sent an agent into Cash Cow's store to attempt to purchase a firearm in a way that would have been unlawful as apparent to Cash Cow. On the first occasion, Cash Cow's store manager, Nelson Alonso, sold a firearm to the undercover ATF agent even though the agent told Alonso that he was a convicted felon not lawfully in the United States. When Alonso ran the required background check on the agent, he misspelled the name given to prevent the national registry from retuning any flags. On the second occasion, the same agent attempted another firearm purchase from Cash Cow. This time, Alonso correctly input the name into the national registry, which returned an instruction to deny the sale. Nonetheless,

No. 16-41449

Alonso completed the transaction, concealing the true purchaser by adding the record of the transaction to an earlier sale to a different, legitimate customer. On the third occasion, the same agent attempted yet another firearm purchase from Cash Cow. This time, he brought his "girlfriend" (another ATF agent) to fill out any paperwork and be subject to the background check instead of the true purchaser—a so-called "straw purchase." Alonso sold three firearms to the agent by subjecting his "girlfriend" to a background check instead of him.

The ATF understandably chose to arrest and prosecute Alonso. It obtained and executed a search warrant at Cash Cow's store for the transaction records incriminating Alonso. Alonso was charged with selling a firearm to a felon and pleaded guilty. The ATF made Munz aware of the matter, but took no further action against Cash Cow at that time.

A year later, in early 2014, the ATF conducted an unannounced compliance inspection on Cash Cow to review all of its firearms-related business activity since the Alonso incident. The inspection revealed numerous violations of the Gun Control Act both stemming from and going beyond the Alonso incident. Finally satisfied that perhaps Cash Cow should no longer be in the business of dealing firearms, the ATF sent Cash Cow notice that it intended to revoke Cash Cow's FFL.

Cash Cow invoked its right to an administrative hearing to contest the revocation, at which it was represented by counsel. The ATF appointed a hearing officer to preside, and ATF division counsel represented the government. After hearing and reviewing the evidence, the hearing officer concluded that Cash Cow had willfully violated the Gun Control Act and recommended that the ATF uphold the revocation of its FFL. He entered an extensive memorandum recounting the events of the hearing and announcing his findings. The ATF's Houston Director of Industry Operations, who had

observed the hearing, agreed and issued Cash Cow a final notice that its FFL was revoked.

The ATF's final list of violations committed by Cash Cow employees, none of which Cash Cow contests, is as follows:

- On three different occasions, selling a firearm to a person known to be subject to a federal firearm prohibition in violation of 18 U.S.C. § 922(d)(1), (5) and 27 C.F.R. § 478.99(c)(1), (5);
- Failing to timely and accurately report the sale of two or more semiautomatic rifles to the same person in violation of 18 U.S.C. § 923(g)(5)(A) and 27 C.F.R. § 478.125;
- On twelve different occasions, failing to timely and accurately report the sale of two or more pistols or revolvers to the same unlicensed person in violation of 18 U.S.C. § 923(g)(3)(A) and 27 C.F.R. § 478.126a;
- On seven different occasions, failing to timely and accurately record the disposition of a firearm in violation of 18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. § 478.125(e);
- Selling a firearm to an unlicensed person without waiting for the applicable period of time to trigger an exception in violation of 18 U.S.C. § 922(t) and 27 C.F.R. § 478.102(a)(2)(ii);
- On two different occasions, selling a firearm to an unlicensed person without any exception available in violation of 18 U.S.C. § 922(t) and 27 C.F.R. § 478.102(a);
- Making a false statement on a federal firearm form in violation of 18 U.S.C. § 923(m) and 27 C.F.R. § 478.128(c);
- Selling a firearm without recording the transaction in violation of 18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. § 478.124(a)(1);
- On four different occasions, failing to execute the required paperwork in violation of 18 U.S.C. § 922(m) and 27 C.F.R. § 478.21(a);

- On sixteen different occasions, failing to get the required documentation from the transferee upon sale of a firearm in violation of 18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. § 478.124(c)(1);

- On ten different occasions, selling a firearm without verifying the transferee's identity in violation of 18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. § 478.124(c)(3)(i);

- On fourteen different occasions, selling a firearm without recording national database information on the required paperwork in violation of 18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. § 478.124(c)(3)(iv);

- On three different occasions, selling a firearm without indicating on the required paperwork what firearm was sold in violation of 18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. § 478.124(c)(4);

- On three different occasions, failing to sign and certify the required paperwork in violation of 18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. § 478.124(c)(5).

Cash Cow then exercised its right to challenge the revocation of its FFL in federal court; it filed a complaint against the ATF's Houston Director of Industry Operations (styled as the respondent in this lawsuit). Cash Cow sought a temporary restraining order allowing it to keep its FFL and stay in business during the pendency of the federal-court challenge. However, it then withdrew that application because the ATF agreed not to issue the formal revocation until the lawsuit was resolved.

The ATF moved for summary judgment. In response, Cash Cow moved for a stay of summary judgment under Federal Rule of Civil Procedure 56(d) to allow more time for discovery, arguing that it should be permitted to discover several documents and recordings in the ATF's possession relating to the investigation against Cash Cow. The district court granted the motion in part and extended the time Cash Cow had to respond to summary judgment. It also

informed Cash Cow that, even after its response was due, it would be permitted to supplement its response with any additional information discovered. Cash Cow simultaneously filed its summary judgment response and a motion to compel the ATF to turn over its internal files relating to the Alonso investigation—files that the ATF claimed were privileged and unnecessary.

In the same opinion, the district court both denied Cash Cow's motion to compel and granted the ATF's motion for summary judgment. The court was satisfied that the ATF had followed the correct administrative procedure and that the undisputed evidence in the administrative record established that Cash Cow had committed at least one willful violation of the Gun Control Act. It decided that it did not need the evidence that Cash Cow sought to compel discovery of because the administrative record was sufficient.

Shortly after the court ruled, Cash Cow filed an "emergency motion to enforce F.R.C.P. 62(a) automatic stay." It explained that the ATF had agreed to allow Cash Cow to stay in business with an FFL during the judicial review process, but had taken action to strip Cash Cow of its FFL privileges within an hour of the district court's summary judgment ruling. According to Cash Cow, this violated Federal Rule of Civil Procedure 62(a)'s 14-day automatic stay of execution of judgment. The ATF replied that it would not deny Cash Cow any FFL privileges during those 14 days, so the motion was moot. The district court denied the motion, finding that the ATF's authority to revoke Cash Cow's FFL was statutory, not the result of a judgment. Moreover, though Cash Cow did not seek a stay pending appeal (it sought only a 14-day automatic stay), the district court considered one sua sponte but declined to impose such a stay.

No. 16-41449

## II.

We review a district court's grant of summary judgment de novo, applying the same standard as the district court.[1] Summary judgment may be affirmed for any reason raised to the district court and supported by the record, and we are not bound by the grounds articulated by the district court.[2] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] "When considering a motion for summary judgment, the court views all facts and evidence in the light most favorable to the non-moving party."[4] Unlike in other cases in which we take appeal from administrative action, we are instructed to provide "de novo judicial review" of the ATF's revocation decision.[5] We review discovery rulings for abuse of discretion.[6]

## III.

Cash Cow appeals (A) the district court's grant of summary judgment, (B) the court's denial of its motion to compel, and (C) the court's denial of its motion to enforce the automatic stay.

## A.

With begin with Cash Cow's primary challenge, which is to the district court's grant of summary judgment against it.

### 1. Applicable Principles

The Gun Control Act of 1968 requires every person engaged "in the business of importing, manufacturing, or dealing in firearms, or importing or

---

[1] *Roberts v. City of Shreveport*, 397 F.3d 287, 291 (5th Cir. 2005).

[2] *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1146 (5th Cir. 1993).

[3] FED. R. CIV. P. 56(a).

[4] *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010).

[5] 18 U.S.C. § 923(f)(3).

[6] *Duke v. Univ. of Tex. at El Paso*, 729 F.2d 994, 995 (5th Cir. 1984).

7

manufacturing ammunition" to be properly licensed by the Attorney General.[7] This license is called a federal firearms license, or FFL. Even after a person has been licensed, "[t]he Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter."[8]

A licensee whose FFL the Attorney General decides to revoke has several procedural rights. First:

> [A]ny holder of a license which is revoked shall receive a written notice from the Attorney General stating specifically the grounds . . . upon which the license was revoked. Any notice of a revocation of a license shall be given to the holder of such license before the effective date of the revocation.[9]

Second:

> If the Attorney General . . . revokes[] a license, he shall, upon request by the aggrieved party, promptly hold a hearing to review his . . . revocation. In the case of a revocation of a license, the Attorney General shall upon the request of the holder of the license stay the effective date of the revocation. A hearing held under this paragraph shall be held at a location convenient to the aggrieved party.[10]

Third:

> If after a hearing held under paragraph (2) the Attorney General decides not to reverse his decision to . . . revoke a license, the

---

[7] 18 U.S.C. § 923(a).
[8] *Id.* § 923(e).
[9] *Id.* § 923(f)(1).
[10] *Id.* § 923(f)(2).

No. 16-41449

Attorney General shall give notice of his decision to the aggrieved party. The aggrieved party may at any time within sixty days after the date notice was given under this paragraph file a petition with the United States district court for the district in which he resides or has his principal place of business for a de novo judicial review of such denial or revocation. In a proceeding conducted under this subsection, the court may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered at the hearing held under paragraph (2). If the court decides that the Attorney General was not authorized to deny the application or to revoke the license, the court shall order the Attorney General to take such action as may be necessary to comply with the judgment of the court.[11]

The Attorney General has delegated these functions to the ATF.[12]

"A district court employing a de novo standard of review should not attach any presumption of correctness to the ATF's decision; however, a court may give the ATF's determination as much weight as the court deems appropriate."[13] Although review must be de novo, the court is "not required to hold an evidentiary hearing and may enter judgment solely based upon the administrative record."[14] The court may consider evidence not presented at the administrative hearing, but it is within the discretion of the district court

---

[11] *Id.* § 923(f)(3).

[12] 28 C.F.R. § 0.130.

[13] *Arwady Hand Trucks Sales, Inc. v. Vander Werf,* 507 F. Supp. 2d 754, 758 (S.D. Tex. 2007); s*ee also Stein's, Inc. v. Blumenthal,* 649 F.2d 463, 466–67 (7th Cir. 1980).

[14] *Arwady,* 507 F. Supp. 2d at 758.

whether to do so.[15] The Administrative Procedures Act does not apply to revocation hearings by the ATF.[16]

In reviewing the ATF's decision, the question is whether it was authorized to revoke the petitioner's FFL.[17] Here, Cash Cow admits that all of the violations detected by the ATF occurred, but insists that they were not committed "willfully" as required for revocation by § 923(e).

A license holder commits a willful violation under § 923 if the licensee knew of his legal obligation and purposefully disregarded or was plainly indifferent to the record-keeping requirements. Additionally, a violation is willful if the licensee has been informed of the regulations, warned of violations, and continually violates those requirements. Furthermore, knowledge of the particular regulation violated is not required so long as the licensee disregarded a known legal obligation. Section 923 does not require evidence of a "bad purpose" or "evil motive" in order to support a showing of willfulness. "Factors tending to establish 'willfulness' as a matter of law include (1) a licensee's proven knowledge of its record keeping obligations, (2) persistent failure 'to comply with . . . the same or similar' provisions, and (3) receipt of a warning letter 'advising [the licensee] that repeated violations of the regulations could result in the revocation of its license.'" "[W]here a licensee understands his or her legal obligations under the GCA, yet fails to abide by those obligations, his or her license can be

---

[15] *Id.* (citing *Strong v. United States*, 422 F. Supp. 2d 712, 720 n.12 (N.D. Tex. 2006)).
[16] *Id.* at 758–60.
[17] *Id.* at 761.

denied or revoked on the basis that the dealer 'willfully' violated the GCA."[18]

A single willful violation authorizes the ATF to revoke the violator's FFL, regardless how severe, though the frequency and severity of the violations can be relevant to willfulness.[19] Bearing these principles in mind, we turn to the facts of this case.

*2. Discussion*

First, to what is undisputed. Cash Cow admits that its employees committed all of the violations of the Gun Control Act found by the ATF to have occurred. It further acknowledges that it was aware of all of its obligations under that Act—as mentioned, its owner, Munz, is an FFL veteran who prides himself on having an exemplary FFL compliance record. Finally, it concedes that Alonso himself acted willfully when he violated the Act. Cash Cow disputes first whether Alonso's actions can here be imputed to it; and second whether any individual violation committed by an employee other than Alonso was committed willfully.

First, Cash Cow argues that Alonso was a "rogue employee" whose actions cannot be imputed to it for the purpose of the Gun Control Act. We disagree. Under the Act, "where . . . the licensee is a corporation, it is chargeable with the conduct and knowledge of its employees."[20] While acknowledging this, Cash Cow urges us to import into this context the conceptual framework of *Monell v. Department of Social Services of City of New York*, which bars respondeat superior liability of municipalities under 42 U.S.C. § 1983 and requires a showing of the culpability of the municipality

---

[18] *Arwady*, 507 F. Supp. 2d at 761–62 (citations omitted).

[19] *Id.* at 762 n.11.

[20] *Stein's, Inc.*, 649 F.2d at 467–68; *see also Moreno v. Bureau of Alcohol, Tobacco, Firearms, Explosives*, 113 F. Supp. 3d 916, 923 (W.D. Tex. 2015); *Arwady*, 507 F. Supp. 2d at 763 n.12.

itself.[21] Cash Cow Pawn Shop, however, is not a municipality, and this is not a case under § 1983. Cash Cow *is* vicariously liable for the illegal acts of its employees regardless whether it approved of them. We reject its argument to the contrary. Alonso's multiple undisputedly willful violations of the Gun Control Act are attributable to Cash Cow and authorized the ATF to revoke its FFL. Summary judgment was proper on this basis.

We need go no further; a single willful violation suffices to sustain the ATF's revocation decision. Nonetheless, we address as an alternative holding Cash Cow's second argument about the violations committed by its employees other than Alonso. As it goes, those numerous other violations were mere "paperwork violations" that the ATF frequently overlooks and that we, too, should overlook. This misses the mark. Our question is not whether the ATF fairly distributes its revocation decisions among FFL-holders who violate the Gun Control Act; it is whether the ATF was authorized by the Act to revoke. And the fact that Cash Cow's violations were paperwork violations does not make them any less serious or less willful. The Gun Control Act imposes significant record-keeping obligations upon firearms dealers as part of Congress's carefully crafted plan to ensure that firearms do not end up in the wrong hands.

The sheer volume of violations admitted by Cash Cow here makes willfulness nigh inescapable. On more than fifty different occasions other than the Alonso incident, Cash Cow employees failed to satisfy their burden under the Act. And a significant number of those occurred *after* the store was the subject of a federal criminal investigation resulting in the arrest and conviction of its store manager. When well-trained employees under the supervision of an

---

[21] 436 U.S. 658, 694–95 (1978); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

FFL veteran commit the volume of violations described above against that backdrop, there can be little doubt that at least one of the violations, and likely more, was committed with reckless disregard to known federal obligations—willfully.

This court has, albeit in unpublished cases, affirmed summary judgment for the ATF upholding FFL revocation on less extreme facts than here. For example, in *Athens Pawn Shop Inc. v. Bennett*, the pawn shop did not dispute the found violations, but argued "that revocation of its license was not warranted because the violations were not willful and were due to inadvertent and technical record-keeping mistakes."[22] We affirmed summary judgment for the ATF:

> [T]he evidence showed that Athens Pawn Shop had been cited on at least three prior occasions for the same or similar violations of the requirements for maintaining accurate acquisition and disposition records. It was also specifically warned that its license was contingent on compliance with federal regulations and that future violations would be considered willful and could jeopardize its license. It is indisputable that Athens Pawn Shop was aware of its legal obligations but committed numerous subsequent infractions. Repeated violation of known legal requirements is sufficient to establish willfulness.[23]

Similarly, in *Weaver v. Harris*, the former licensee did not challenge any of the found violations, but rather argued that revocation was not warranted because his violations of the federal recording requirements were not willful.[24] Again, we affirmed summary judgment for the ATF:

---

[22] 364 F. App'x 58, 59 (5th Cir. 2010) (unpublished).

[23] *Id.* at 59–60.

[24] 486 F. App'x 503, 505 (5th Cir. 2012) (unpublished).

Weaver's 2009 violations, which stemmed from his failure to record the disposition of 213 firearms in his Acquisitions and Dispositions book, were not the first time he was cited for the same recording violation. In 1998, Weaver was cited for failing to account for seven firearms in his Acquisitions and Dispositions book. Yet despite this previous violation and his knowledge of federal firearm recording requirements, Weaver violated those same requirements in 2009. And not only did he violate the same requirements, the number of violations increased dramatically. Moreover, even after he was informed of the 2009 violations, Weaver failed to take immediate action to rectify the recording deficiencies. Because the "[r]epeated violation of known legal requirements is sufficient to establish willfulness," we conclude that the district court properly granted summary judgment in favor of the Director.[25]

Summary judgment is even more compelling here.

### B.

We turn to Cash Cow's appeal of the district court's discovery ruling. As explained, Cash Cow asked the district court to compel the ATF to turn over its internal investigation file on Cash Cow. The ATF opposed on the grounds that its internal files were privileged, irrelevant, and unnecessary to the court's summary judgment ruling because the case could be decided on the administrative record alone. The district court denied the motion to compel because it found that it needed no additional evidence beyond the administrative record to rule on the pending motion for summary judgment.

That decision was not an abuse of discretion. The administrative record in this case is robust, with some hundreds of pages of testimony and exhibits.

---

[25] *Id.* (citations omitted).

Cash Cow did not object to any of the evidence presented at the hearing. By all accounts, the ATF representative who testified at the hearing recounted all of the evidence pertaining to the Cash Cow investigation. Moreover, the fact that Cash Cow does not dispute any of the violations found by the ATF makes unclear exactly what is sought. Cash Cow wants a full trial on the issue of willfulness alone, but both in its brief and at oral argument, it was unable to point to a genre of relevant evidence it hopes to discover through the ATF's internal investigation file. We affirm the district court's denial of Cash Cow's motion to compel.

## C.

We conclude with Cash Cow's argument that the district court erred by declining to enforce the automatic stay provided by Federal Rule of Civil Procedure 62(a). Under that Rule, with an exception not relevant here, "no execution may issue on a judgment, nor may proceedings be taken to enforce it, until 14 days have passed after its entry."[26]

Apparently, mere hours after the district court's grant of summary judgment, the ATF began the process of withdrawing Cash Cow's access to the national firearms database—the first concrete step in the process of actually revoking an FFL. Cash Cow filed an emergency motion urging the district court "to enforce F.R.C.P. 62(a) automatic stay," arguing that it was entitled to a 14-day window during which to maintain its FFL privileges. The ATF conceded to giving it that window to moot the motion. Nonetheless, the district court ruled on the merits, holding that ATF's authority to revoke Cash Cow's FFL was statutory, not the result of a judgment, and therefore that the automatic stay did not apply.

---

[26] FED. R. CIV. P. 62(a).

No. 16-41449

It is not clear to us what relief Cash Cow seeks by raising this challenge. Even if we wholly agreed, that would mean only that Cash Cow was entitled to a 14-day period last year during which to file an application for a stay pending appeal (which it never did). Passing on the merits of the district court's holding at this point would bring an advisory opinion, which we cannot offer.

## IV.

The district court's grant of summary judgment and its denial of Cash Cow's motions are affirmed.